# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Ronald A. Guzman | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 CR 78 | **DATE** | 11/26/2001 |
| **CASE TITLE** | USA vs. XAVIER CASTRO | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m)   ☐ General Rule 21   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Defendant's motion to suppress testimony and evidence regarding statements made by the Defendant to a Police Commander and Assistant State's Attorney on March 13, 1997 is denied.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | |
|---|---|---|---|
| | No notices required, advised in open court. | | Document Number |
| | No notices required. | number of notices | |
| | Notices mailed by judge's staff. | NOV 2 8 2001 | |
| | Notified counsel by telephone. | date docketed | |
| ✓ | Docketing to mail notices. | | |
| | Mail AO 450 form. | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | 4/ |
| TBK | courtroom deputy's initials | 01 NOV 27 PM 4:47 date mailed notice | |
| | | Date/time received in central Clerk's Office | mailing deputy initials |

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) | NO. 01 CR 78 |
| v. | ) | JUDGE RONALD A. GUZMAN |
| XAVIER CASTRO. | ) | |
| Defendant. | ) | |

DOCKETED
NOV 28 2001

## MEMORANDUM OPINION AND ORDER

### INTRODUCTION

Pending is the Defendant Xavier Castro's motion to suppress testimony and evidence regarding statements made by the Defendant to a Police Commander and Assistant State's Attorneys on March 13, 1997. For the reasons set forth below this motion is denied.

### BACKGROUND FACTS

On or about January 3, 1996, Defendant, Xavier Castro, along with three other police officers, was assigned to patrol the 20th Police District (Ind. ¶ 3). During the course of the patrol it is alleged that the Defendants entered Anselmo Echevarria's apartment without a search warrant or consent (Ind. ¶ 3). Echevarria's basement apartment is at 3814 W. Wrightwood, in Chicago's 25th Police District (Ind. ¶ 2).

1

Echevarria and Miguel Herrera were in the apartment when the Defendant and three other police officers allegedly arrived (Ind. ¶ 4). The officers detained both men, and searched the apartment (Ind. ¶ 4-6). The search revealed cocaine and money, which the officers seized (Ind. ¶4-6). The officers then arrested Herrera and Echevarria and brought them into the 20th District station. (Ind. ¶ 7).

The defendant's subsequent police report did not describe that the arrest took place in Echavarria's home at 3814 W. Wrightwood (Ind. ¶ 8). Instead, the report described a drug deal between Echevarria and Herrera that took place at 5400 N. Lincoln Avenue (Ind. ¶8). 5400 N. Lincoln Avenue is 40 blocks from Echevarria's apartment (Prosecution's Answer p. 4). The report also stated that Echevarria and Herrera were arrested at 5400 N. Lincoln Avenue and not in Echevarria's apartment (Ind. ¶ 8). Defendant also neglected to report and place into evidence, the seized money(Ind. ¶ 8, 10).

On January 29, 1996, Castro testified under oath in front of a Cook County grand jury (Ind. ¶ 11). He stated that he had seen Echevarria and Herrera conduct a drug transaction at 5400 N. Lincoln Avenue in Chicago (Ind. ¶ 11). Echevarria and Herrera were subsequently indicted by the Cook County grand jury for various drug offenses (Ind. ¶ 12).

On March 12, 1997, Castro and the three other officers were on hand to testify in Echavarria's and Herrera's trial (Ind. ¶ 13). During the pre-trial sessions with the prosecution, Castro and the other officers continued to describe the events that took place on January 3, 1996 as consistent with their police report, and their prior grand jury testimony (Ind. ¶ 13). During opening statements, the defense attorney for Echavarria

and Herrera alluded to evidence that Echavarria was at his home at the previously stated time of arrest (9:00 p.m.) and not at 5400 N. Lincoln, as the police had stated in their report (Petrakis GJ p. 21).

After hearing the opening statement, the Assistant State's Attorney, Nick Grapsas, requested and received a continuance and alerted his supervisor, Assistant State's Attorney, Peter Petrakis of the defense attorney's opening statements (Petrakis GJ pp. 21-22). Upon arriving at the courtroom, the defense attorney's told Petrakis that they had federal electronic monitoring records which showed Echavarria to be at home at the time when the arrest took place (Petrakis GJ p. 21-22). The computerized record of Echavarria's location did not indicate an out-of-range signal until 9:00 p.m. (Petrakis Stmt. p. 2). The out-of-range signal is activated when the monitored subject goes beyond 100 feet of the device installed at his residence (Petrakis Stmt. p. 2). Echavarria's and Herrera's attorneys hypothesized that if the police reports said the arrest had occurred at 9:00 p.m. at 5400 N. Lincoln Ave., three miles from Echavarria's house, the electronic monitoring reports showed the police report to be erroneous (Petrakis Stmt. p. 6). Instead, Echavarria's and Herrara's attorneys believed that the two men had been arrested at Echavarria's apartment, at 3814 W. Wrightwood (Petrakis Stmt. p. 2). Assistant State's Attorney Petrakis then spoke the other three officers on duty with Castro that night and discussed the possibility that the electronic monitoring records were unreliable (Petrakis Stmt. p. 2).

The next morning, March 13, 1997, the *Chicago Tribune* ran an article about the case (Pros. Ex. 4) titled, "Cops falsified their report in drug case." The article reported

3

the events of the previous day in court, and quoted Petrakis, who said, "We are confident of the integrity of the police" (Pros. Ex. 4).

The same morning, after reading the article, Commander Martorano interviewed Castro regarding the allegations made against him in the newspaper (Martorano Stmt. March 14, 1997, p. 1). According to Martorano, Castro maintained that the arrest had been at 5400 N. Lincoln (Martorano Stmt. March 25, 1997, p. 2). Martorano reported that Castro told him that they had brought the two prisoners into the station, and that one of the prisoners indicated that he wanted to tell the police who his supplier was (Martorano Stmt. March 25, 1997, p. 2). The prisoner said that before he could, he needed his medicine which was at home, 3814 W. Wrightwood (Martorano Stmt. March 25, 1997, p. 2). According to Martorano, Castro told him that he went with the prisoner to 3814 W. Wrightwood, retrieved the medicine, and at that time, noticed a receiver for a home monitoring device (Martorano Stmt. March 25, 1997, p. 2). Martorano said that Castro told him at the relevant time the prisoner did not have a device on his leg (Martorano Stmt. March 25, 1997, p. 2). Castro also mentioned that he made phone calls, including a call to a number on the receiving device, where the people he contacted said it wasn't their device (Martorano Stmt. March 25, 1997, p. 2). At one point, Castro allowed the prisoner to use the bathroom (Martorano Stmt. March 25, 1997, p. 2). Castro believed that the prisoner might have put the ankle bracelet on at that point, but he did not remember seeing the prisoner wearing the bracelet that night (Martorano Stmt. March 25, 1997, p. 2). Castro repeatedly told Martorano that he could not remember things so well (Martorano Stmt. March 25, 1997, p. 2).

According to Martorano, several hours later, Castro returned with a new story (Martorano Stmt. March 25, 1997, p. 2). In his second meeting with Commander Martorano, Castro said he had spoken with his partner, and remembered the events of January 3, 1996 with more clarity (Martorano Stmt. March 25, 1997, p. 2). According to Martorano, Castro maintained that the arrest occurred at 5400 N. Lincoln, that the arrestee had a bracelet on his ankle, that the police transported him to the police station, and like before, the man indicated that he would cooperate with authorities, but needed his medication (Martorano Stmt. March 25, 1997, p. 2). The prisoner gave Castro the key and Castro drove to 38[14] W. Wrightwood and contacted the landlord (Martorano Stmt. March 25, 1997, p. 2). Castro also said he contacted somebody with the bracelet, and they picked it up the next morning (Martorano Stmt. March 25, 1997, p. 2). Martorano then said "You know, you came in with one story, and I told that story to several people, and now you come in with another story, it may sound like you're lying." According to Martorano, Castro responded by saying, " I know it looks like I'm lying, but I'm not, I'm telling the truth."

After his second conversation with Castro, at 4:00 p.m. on March [13], 1997, Commander Martorano obtained a Chicago Police Department complaint number ("C.R.") because Castro told him two stories and it seemed like some officers might have participated in improper conduct (Martorano Stmt. March 25, 1997, p. 3-4). Martorano claims that his C.R. had nothing to do with his conversation with Petrakis at noon that day (Martorano Stmt. March 25, 1997, p. 3). Commander Martorano talked to Assistant States Attorney Petrakis again between 4:15 and 4:30 and asked Petrakis if he had any

5

additional information (Martorano Stmt. March 25, 1997, p. 4). Petrakis stated that he was talking with Castro about the case (Martorano Stmt. March 25, 1997, p. 4).

Castro met with Assistant State's Attorneys Petrakis and Graspas at the State's Attorney's Office at about 4:00 on March 13, 1997(Petrakis G.J. p. 23). Petrakis asked questions about probable cause for the arrest and Castro stated that an informant had given him information about the drug deal on 5400 N. Lincoln and that one of the participants names was "Sam" (Petrakis Stmt. p. 3). According to Petrakis, Castro had trouble providing many details about the informant and other key facts(Petrakis Stmt. p. 3). Furthermore, Castro could not relate how Echevearria and Herrera arrived at the scene and where he and the other officers had been for their surveillance (Petrakis Stmt. p. 3). Petrakis stated that he did not believe the case happened that way, and told Castro that he wanted to dismiss the case. (Petrakis Stmt. p. 4) Petrakis mentioned the possibility of looking into the electronic monitoring records, but given the time and the effort into investigating the records, he needed to know the truth from Castro (Petrakis GJ p. 24).

At that point Castro provided Petrakis with a hypothetical question (Petrakis GJ p.24). He asked what would happen if things didn't happen the way the officers had said originally (Petrakis GJ p. 24). Instead, police arrived in back of 3814 W. Wrightwood, saw Herrara get out of the car, followed him into the back door and saw Echevarria with cocaine on a table and arrested them in the home (Petrakis GJ p. 4). Petrakis asked if that really happened and Castro said it did.

At 9:45 p.m. on March 13, 1997, Commander Martorano got a call from the chief investigator at the State's Attorney's Office. According to Martorano, the investigator

6

stated that Castro "[g]ave it up to the ASA" and had admitted to perjuring himself during the grand jury(Martorano Stmt. p. 5). Martorano told him there was already a CR number (Martorano Stmt. p. 5).

The next day, March 14, 1997, Assistant State's Attorney Petrakis met with his supervisors and although he was reluctant to do so, was told that it was important to give a statement to Internal Affairs(Petrakis, GJ p. 25). Later that day Castro was also interviewed by Internal Affairs. He was represented by his attorney, Joseph Roddy. He was read his Miranda rights and invoked his privilege against self-incrimination and refused to answer (Def. St.). He was then reassigned to administrative duties.

On March 24, 1997, the charges against Echevarria and Herrera were dismissed. (Petrakis GJ p. 25). On January 25, 2001, a grand jury returned an indictment that charged Xavier Castro with one count of conspiring with three other Chicago Police officers to violate the civil rights of Anselmo Echevarria and Miguel Herrera, under 18 U.S.C. § 241. (Ind. p. 1) The indictment also charged Xavier Castro with a second count of violating their civil rights under 18 U.S.C. § 242. (Ind. p. 7)

## DISCUSSION

In Defendant's motion to suppress evidence, Castro makes two claims. First, Castro claims as a matter of law, any statements allegedly made by him to Chicago Police Department Commander Martorano and the Assistant State's Attorneys should be suppressed because they were coerced and are in violation of his Fifth Amendment rights and the Due Process Clause (Def.'s Mot. p. 5) (Def.'s Rep. p. 1). Second, Castro claims that his alleged statements to the Assistant State's Attorneys were taken in violation of the Fifth Amendment and the Due Process Clause and should be suppressed because of

7

the failure of the Assistant State's Attorneys to give him his *Miranda* warnings (Def.'s Mot. p. 5).

### Evidentiary Hearing

The Defendant, has the burden of establishing the necessity of a hearing. *United States v. Rodriguez*, 69 F.3d 136, 141 (7th Cir. 1995); *United States v. Randle*, 966 F.2d 1209, 1212 (7th Cir. 1992). The court must conduct a hearing "only if evidence on an issue of fact is necessary to the resolution of the motion." *United States v. Rollins*, 862 F.2d 1282, 1291 (7th Cir. 1989). In order to necessitate a hearing, the defendant's submission must demonstrate that there is a disputed material issue of fact. *United States v. Goudy*, 792 F.2d 664, 667 (7th Cir. 1986). A defendant must present "definite, specific, detailed, and nonconjectural" facts that justify relief before a district court will grant a suppression hearing. *United States v. Randle*, 966 F.2d 1209 (7th Cir. 1992); *United States v. Hamm*, 786 F.2d 804, 807 (7th Cir. 1986).

The Defendant's motion to suppress evidence is based on contested issues of law, not fact(See Def.'s Mot. pp. 4-5). The Defendant claims that the statements he made to Commander Andrew Martorano and Assistant State's Attorney Peter Petrakis and Assistant State's Attorney Nicolas Grapsis on March 13, 1997 ought to be suppressed because they were taken in violation of his constitutional rights (Def.'s Mot. p. 1). Specifically, the Defendant claims that the failure of Martorano and Petrakis to give him his Miranda warnings, and certain Chicago Police Department policies which implied that he would lose his job if he refused to answer self-incriminating questions were a violation of the his rights under the Fifth Amendment and the Due Process clause (Def.'s Mot. 4-5). At no time in his motions does the Defendant raise disputed issues of material

8

fact. Therefore, the Defendant's motion to suppress evidence can be decided without an evidentiary hearing.

## Motion to Suppress Evidence

### 1. Claims Pursuant to *Rule 51* and *Garrity*

Castro's first argument puts forth that his answers to questions asked by Commander Martorano and Assistant State's Attorney Petrakis are protected from use in his criminal prosecution pursuant to *Garrity v. New Jersey*, 385 U.S. 493 (1967) and Chicago Police Board Rule 51.

In *Garrity v. New Jersey*, the Supreme Court held that when police officers who were being investigated were given a choice between either incriminating themselves or losing their jobs under a New Jersey statute, their confessions were not voluntary, but coerced, and the Fourteenth Amendment barred their use in a subsequent criminal prosecution. *Id.* at 496. The Supreme Court of New Jersey had ordered the Attorney General to investigate municipal court irregularities regarding fixed traffic tickets. *Id.* at 494. Prior to questioning, the police officers being investigated were advised that anything they might say could be used against them in a state court proceeding, that the privilege to refuse to answer would tend to incriminate them, and if they refused to answer, they would be subject to removal from office. *Id.* at 494. The answers that some of the officers gave were used against them in the subsequent prosecution regarding the fixed traffic tickets. *Id.* at 495. The court held that the "choice imposed on the petitioners was one between self-incrimination or job forfeiture," and the officer's "statements were infected by the coercion inherent in this scheme of questioning and cannot be sustained as voluntary under our prior decisions." *Id.* at 496-498.

9

The following year, the Supreme Court decided a pair of related cases. *See Gardner v. Broderick*, 392 U.S. 273 (1968) and *Uniformed Sanitation Men Ass'n. v. Commissioner of Sanitation*, 392 U.S. 280 (1968). This time, public employees received similar threats, but did not provide statements and were subsequently fired. *Gardner*, 392 U.S. 273; *Uniformed Sanitation*, 392 U.S. 280. In both cases, the Supreme Court held that public employees could not be fired for exercising their privilege against self-incrimination when they refused to waive it. In *Gardner*, a policeman was subpoenaed and appeared before a grand jury which was investigating bribery and corruption in the police force. *Gardner*, 392 U.S. at 274. The policeman was advised that the grand jury proposed to examine him regarding the performance of his official duties. *Id.* While he was advised of his privilege against self-incrimination, it was requested that he sign a waiver of immunity after being told that he would be fired if he didn't. *Id.* The policeman refused to sign. *Id.* *Uniformed Sanitation* presented a similar fact pattern regarding public employees of the New York Sanitation Department called to testify in front of a grand jury. 392 U.S. at 280-81.

Under *Garrity*, the Supreme Court held that public employees could not be fired for exercising their privilege against self-incrimination, after being presented with a choice between "surrendering their constitutional rights or their jobs." *Uniformed Sanitation*, 392 U.S. at 284; *Gardner*, 392 U.S. at 279. In *Wiley v. Doory*, 14 F. 3d 993 (4th Cir. 1994) Justice Powell, sitting by designation with the Fourth Circuit, articulated the import of the *Garrity* line of cases: "If the State presents a person with the "*Hobson's* choice" of incriminating himself or suffering a penalty, and he nevertheless refuses to respond, the State cannot constitutionally make good on its threat to penalize him." *Id.* at

10

996. "Conversely, if the threatened person decides to talk instead of asserting his privilege, the State cannot use his admissions against him in a subsequent criminal prosecution." *Id.*

Later, in *Confederation of Police v. Conlisk,* 489 F.2d 891 (7th Cir. 1973), the Seventh Circuit struck down a version of Chicago Police Department Rule 51. That version of Rule 51 set out the following prohibited acts:

> Failing to give evidence before the Grand Jury, Coroner's inquest, in court, or before any government administrative body, including the Police Board, when properly called upon to do so, or refusing to testify on the grounds that such testimony might incriminate the member, or refusing to sign a waiver of immunity when requested to do so by a superior officer.

*Id.* at 892-893.

In *Conlisk,* six police officers invoked their privilege against self-incrimination upon being subpoenaed to testify before a grand jury investigation of criminal conspiracies and corruption within the Chicago Police Department. *Id.* at 892. Afterward, all six officers were either fired or suspended for violating Police Department rules, Rule 51 in particular. *Id.* The Seventh Circuit held that "public employees do not have an absolute constitutional right to refuse to account for their official actions and still keep their jobs; their right, conferred by the Fifth Amendment itself, as construed in *Garrity,* is simply that neither what they say under such compulsion nor its fruits can be used against them in subsequent prosecution." *Id.* at 894. A public employer may discharge an employee "for refusing to answer where the employer both asks specific questions relating to the employee's official duties," and advises the employee that failing to respond will result in dismissal, but cannot be used against him in criminal proceedings. *Id.*

11

Section V. of the Chicago Police Department ("CPD") Rules and Regulations sets out the current Rules of Conduct for Chicago Police officers. The preamble states the following:

> "[I]n addition to the positive requirements of all the foregoing sections, the following rules of conduct set forth expressly prohibited acts. Prohibited acts include:" (C.P.D. Rules p. 14) Included among "prohibited acts" are "Violation of any law" (Rule 1), and "Making a false report, written or oral"(Rule 14).

In his argument, Castro relies on an interpretation of Rule 51, which in its current form states the following:

> A. Failure to testify or give evidence before any grand jury, coroner's inquest or court of law or before any governmental, administrative, or investigative agency (city, state, or federal) when properly called upon to do so, and when there is no properly asserted constitutional privilege, or when immunity from prosecution has been granted.
>
> B. Failure to cooperate when called to give evidence statements by any investigative branch or superior officer of the Chicago Police Department or the Police Board when the evidence or statements sought relate specifically, directly and narrowly to the performance of his official duties. If the member properly asserts a constitutional privilege, he will be required to cooperate if advised that by law any evidence or statements given by him cannot be used against him in a subsequent criminal prosecution.

(CPD Rules p. 23)

Castro's claim that his answers to questions asked by Commander Martorano and Assistant State's Attorney Petrakis are protected from use in criminal prosecution pursuant to *Garrity v. New Jersey*, 385 U.S. 493 and *Chicago Police Board Rule 51* fails.

Castro argues that *Chicago Police Department Rule 51* does not allow an officer the constitutional privilege to refuse to answer questions that are narrowly, specifically, and directly related to his employment (Def.'s Rep. p. 3). However, the *New Rule 51*

12

ensures that an officer does not have to choose between waiving his Fifth Amendment rights and facing disciplinary action. A violation of Subsection (a) occurs, only when there is a failure to testify without a "properly asserted constitutional privilege, or when immunity from prosecution has been granted." Under those circumstances, a police officer need only "properly assert" his Fifth Amendment rights to avoid self-incrimination.

Castro's criticism specifically targets Subsection (b). Under Subsection (b), a police officer faces disciplinary action when he fails to "cooperate when called to give evidence statements by any investigative branch or superior officer of the Chicago Police Department or the Police Board when the evidence or statements sought relate specifically, directly and narrowly to the performance of his official duties." Castro criticizes *Rule 51(b)* because while it gives an officer the right to properly refuse self-incrimination, the officer can be fired for claiming that constitutional right (Def.'s Rep. p. 3). Castro finds fault in Rule 51 because a police officer doesn't have "both choices." (Def.'s Rep. p. 3).

Seemingly, when Castro refers to "both choices," he is referring to the choice to assert a constitutional privilege, and the choice to avoid being fired. However, providing "both choices" was not the purpose of the holdings in *Garrity, Conlisk, Gardener* and *Uniformed Sanitation*. Rather, the holdings of those cases served to protect public employees from *a compulsion to choose* either self-incrimination or a lost job. In *Garrity,* the court held that "[t]he choice given petitioners was either to forfeit their jobs or to incriminate themselves." 385 U.S. 493, 497 (1967). In *Gardener* and *Uniformed Sanitation,* the employees were fired for their refusal to sign a waiver of immunity.

13

*Gardner*, 392 U.S. at 274-75; *Uniformed Sanitation*, 392 U.S. at 282-83. In *Conlisk*, the court remarked that the solution to the problem of a public employee being faced with the choice of answering or being dismissed from his job is "that, should he answer, he cannot be criminally prosecuted on the basis of his own testimony." 489 F.2d at 894.

The purpose of the holdings in cases like *Garrity* and *Conlisk* have been installed in the structure of amended *Rule 51(b)*, which removes the threat of penalty for refusal to waive the constitutional privilege and offers immunity for those who claim the privilege and are nevertheless required to testify. Thus, in order for an officer with a valid privilege to violate *Rule 51(b)*, he must assert the privilege, be granted immunity, and then refuse to "give evidence or statements"--an entirely different scenario from the one Castro proposes.

Furthermore, it is undisputed that Castro did not receive any overt or direct threats and thus, according to *Minnesota v. Murphy*, 465, U.S. 420 (1984); *United States v. Humphrey*, 34 F.3d 551 (7th Cir. 1994); and *United States v. Corbin*, 998 F.2d 1377 (7th Cir. 1993), there was no reasonable basis for Castro to believe that his Fifth Amendment rights were in jeopardy and that an assertion of his rights would result in his dismissal. Castro presented the hypothetical question to Petrakis when Petrakis was trying to reach a case management decision as to whether he should dismiss the case or continue the prosecution of Echavarria and Herrera. The hypothetical posed by Castro was voluntarily offered by Castro and no compulsion to choose was present nor a refusal to testify. Petrakis never told Castro that if he did not waive his right to remain silent, he would be punished. Nor is there any evidence in the record to suggest that Petrakis had such authority, or that Castro reasonably believed that he did. Moreover, Martorano

14

never told Castro that if he did not waive his right to remain silent, he would be punished. In the second meeting with Martorano, Castro returned to volunteer a new version of the event.

**2. Castro's *Miranda* Rights**

The second issue raised in Castro's motion is that his alleged statements to the Assistant State's Attorneys were taken in violation of the Fifth Amendment and the Due Process Clause and should be suppressed because of the failure of the Assistant State's Attorneys and Police Commander Martorano to give Castro his *Miranda* warnings Castro relies on four similar sources to support his contention that he was entitled to be read his rights.

First, 65 *Ill. Comp. Stat.* 5/10-1-18.1, regards police removals and suspensions for cities over 500,000 and states the following:

> Before any such officer or employee may be interrogated or examined by or before any disciplinary board or departmental agent or investigator, the results of which hearing, interrogation or examination may be the basis for filing charges seeking his removal or discharge, he must be advised in writing as to what specific improper or illegal act he is alleged to have committed; he must be advised in writing that his admissions made in the course of the hearing, interrogation or examination may be used as the basis for charges seeking his removal or discharge; and he must be advised in writing that he has the right to counsel of his own choosing present to advise him at any hearing, interrogation or examination; and a complete record of any hearing, interrogation or examination shall be made and a complete transcript thereof made available to such officer or employee without charge and without delay.

Second, Addendum 1 to the *General Order 93-3* of the police department's general orders as to the conduct of an investigation provides:

> (i) If the allegation under investigation indicates that a recommendation for separation is probable against the member, the member will be given

the statutory administrative proceeding rights, or if the allegation indicates that criminal prosecution is probable against the member, the member will be given the constitutional rights concerning self incrimination prior to the commencement of interrogation.

Third, *Chicago Municipal Code* 2-84-330(I) provides:

> If the allegation under investigation indicates a recommendation for separation is probable against the officer, the officer will be given the statutory administrative proceedings rights, or if the allegation indicates criminal prosecution is probable against the officer, the officer will be given the constitutional rights concerning self-incrimination prior to the commencement of interrogation.

Fourth, the *Police Union Contract*, Article 6.1-Conduct of Disciplinary Investigation states the following:

> Whenever an officer covered by this Agreement is the subject of a disciplinary Investigation other than Summary Punishment, the interrogation will be conducted in the following manner:
>
> (I) If the allegation under investigation indicates a recommendation for a separation is probable against the officer, the officer will be given the statutory administrative proceedings rights, or if the allegation indicates criminal prosecution is probable against the offender, the officer will be given the constitutional rights concerning self-incrimination prior to the commencement of interrogation.

When Martorano spoke to Castro on the morning of March 13, he was doing so in response to the *Tribune* article setting out the defense attorneys' allegations. The language of *Rule 51(b)* ("when called to give evidence or statement") makes it clear that it is not so extreme, and does not apply to basic one-on-one conversations in the superior's office that are not conducted pursuant to an investigation of the officer. It was only after Castro voluntarily returned to Martorano's office, unsolicited, and gave a

16

completely different story, that Martorano opened up a complaint on the defendant There was no *Miranda* like compulsion in Castro's superior asking him about an article in a newspaper.

As to Castro's statements to Petrakis, Castro's theory is that "because of his position as a Chicago Police Officer Castro was required to cooperate with the Assistant Sate's Attorney. This statement is simply not supported by the text of *Rule 51(b)*. *Rule 51(b)* is clearly referring to a failure to answer questions as part of an official investigation of the officer's official conduct. Petrakis' questions to Castro obviously focused on basic pre-trial preparation, the probable cause concerns, as well as potential cross-examination concerns. Castro clearly could have remained silent in the face of Petrakis' questions and Petrakis could not had reasonably foreseen the need for a *Miranda* warning. If anything, Petrakis' statement that the State's Attorney's Office was prepared to spend the time and energy investigating the electronic-monitoring records would have made it clear to Castro that the truth would emerge one way or another. Castro clearly was not being compelled to answer direct, specific, and narrowly tailored questions in the context of an internal affairs interview.

## CONCLUSION

For the reasons set forth above Defendant's motions are denied.

**SO ORDERED.**  ENTERED: 11/26/01

Ronald A. Guzman
United States Judge

17